UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOBY HODNETT,

               Plaintiff,

v.

CHARDAM GEAR COMPANY INC.,

               Defendant.

_____/

Case No. 16-10619

Paul D. Borman
United States District Judge

Mona K. Majzoub
United States Magistrate Judge

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Toby Hodnett worked as a machinist for Defendant Chardam Gear Company, Inc. ("**Chardam**") until he was fired on November 7, 2014. Plaintiff alleges he was on medical leave when he was fired on the basis of injuries he sustained in a car accident the previous August. Plaintiff brought this action against Defendant in the Macomb County Circuit Court on November 6, 2015, and Defendant timely removed it to this Court on February 19, 2016. Plaintiff asserts two claims: one under the Family and Medical Leave Act ("**FMLA**"), 29 U.S.C. § 2615(a), and one under the Michigan Persons With Disabilities Civil Rights Act ("**PWDCRA**"), Mich. Comp. Laws § 37.1201 *et seq.*

Before the Court is Defendant's Motion for Summary Judgment. The Court heard argument on August 7, 2017. For the reasons that follow, the Court will grant

Defendant's Motion as to both claims.

## I. BACKGROUND

### A. Undisputed Facts

#### 1. Plaintiff's employment with Defendant

Plaintiff had worked as a machinist for Defendant for nine and a half years when Defendant terminated his employment on November 7, 2014. (ECF No. 18, Def.'s Mot. Ex. 26, March 24, 2016 Deposition of Toby Hodnett ("**2016 Hodnett Deposition**")[1] at 29:5-6, 38:10-11; Ex. 15.)

On August 21, 2014, Plaintiff was involved in a verbal altercation with his superior, plant manager Erik Schmidt. The altercation was memorialized in a document with the heading "Internal Employee Correspondence" that same day by Jennifer Taylor, another employee of Defendant. (Def.'s Mot. Ex. 1.) In that document, Taylor wrote: "8/21/14 . . . Toby was ranting about Erik the plant manager telling him if he couldn't do his job to go home. . . . Toby told me this would probably be the last time I would see him." (*Id.*)

---

[1] This 2016 Hodnett Deposition was taken in the course of Plaintiff's state-court lawsuit *Hodnett v. Woods, et al.*, Oakland County Circuit Court Case No. 2015-149363-NI, through which he sought compensation for injuries he sustained in the 2014 car accident discussed below. That lawsuit, brought against the driver and owners of the vehicle that collided with Plaintiff's car, was resolved by a confidential settlement on September 12, 2016.

In a deposition conducted on June 27, 2017,[2] in a third lawsuit filed by Plaintiff Hodnett, Schmidt testified that the altercation was over Plaintiff's complaint about having to lift a particular piece of equipment:

> We had, I would say, a huge disagreement that day on what Toby should be working on. And, according to him, this part . . . was too heavy for him to pick up. This part weighs four pounds. And that's when, you know, that was kind of final issue that I had, "If you can't handle this, I can't have you here."
>
> And at that time, I don't know of any medical restrictions or anything else. But that's all I can say about that.
>
> . . .
>
> He said it had to do something with his shoulder. But, my biggest issue was I wanted him to train someone else how to do this operation. And he was unwilling to even hear of -- hear of it that day. He did not want to work with this other person.
>
> . . .
>
> I told him he needs to go home if he can't, you know, handle [a] four-pound part. We cut metal.

(Schmidt Dep. 12:11-19, 13:14-18, 35:15-18.) Schmidt testified that this altercation was the last time he and Plaintiff spoke. (Schmidt Dep. 35:23-24.)

---

[2] Schmidt's deposition was taken in the course of *Hodnett v. Auto-Owners Insurance Company*, Macomb County Circuit Court Case No. 16-3696-NF, a state-court lawsuit which Plaintiff filed on October 17, 2016 to recover unpaid personal injury protection benefits, including medical expenses and wage-loss compensation, from his insurance company. The complaint alleges, *inter alia*: "That on or about August 15, 2014, Plaintiff HODNETT was involved in an automobile incident causing *numerous severe and permanent injuries* and damages to Plaintiff, and Defendant AUTO-OWNERS is liable for all of his No-Fault/PIP benefits arising out of this incident." (Def.'s Mot. Ex. 27 at Pg ID 559 (emphasis added).) The action is currently pending.

### 2. Plaintiff's car accident (August 21, 2014) and subsequent events

As Plaintiff was driving after leaving work later that same day, his car was rear-ended by another vehicle. The collision pushed Plaintiff's car into the vehicle in front of it. (Def.'s Mot. Ex. 2 at Pg ID 290-92.) That evening, Plaintiff went to the emergency department of the Henry Ford Health System's hospital in Clinton Township, Michigan. Plaintiff testified that the hospital staff ordered "a CAT scan, I believe an x-ray and . . . some prescriptions for pain pills," told him that "nothing was broken," and released him after a few hours. (2016 Hodnett Dep. 32:20-33:5.) Plaintiff was also given a note from a physician stating that he had been treated on August 21, 2014, and should be excused from work on August 22. (Def.'s Mot. Ex. 3.)

Plaintiff notified Defendant on Friday, August 22 that he would not be at work that day or on Saturday, August 23 because of the car accident. (Def.'s Mot. Ex. 4.) Thereafter, Plaintiff was absent from work on Monday, August 25 and Tuesday, August 26. An "Internal [Chardam] Employee Correspondence" dated August 25 lists Plaintiff's name and what appears to be his employee number, and reads "won't be in . . . no ride." (Def.'s Mot. Ex. 5.) A similar record dated August 26 simply reads "will not be in today" (Def.'s Mot. Ex. 6), and Defendant represents that Plaintiff called in on that date to relay that message (*see* Def.'s Mot. at 2, Pg ID 261). No reason was provided for that absence. Defendant then asserts that on Friday,

August 29, Plaintiff "requested a vacation day for September 2, 2014 (which was the day after Labor Day)," and supports this assertion with another "Internal Employee Correspondence," dated August 29, which contains Plaintiff's name and employee number, and which simply reads "vacation day for 9-2-14." (Def.'s Mot. at 2, Pg ID 261; Ex. 7.) Unlike the other "Internal Employee Correspondence" documents, this one bears Plaintiff's signature. Plaintiff did not return to work after August 29, 2014.

### 3. Plaintiff's purported leave period and termination (September 2014 – November 2014)

In an affidavit dated June 15, 2017, Plaintiff avers that after his initial treatment at Henry Ford Macomb Hospital, he "kept hoping that [his] neck and back would heal and feel better, but instead the pain continued and worsened." (Pl.'s Resp. Ex. 1, Affidavit of Toby Hodnett at ¶ 3.) Plaintiff sought continuing treatment at Michigan Spine & Joint Center, PC ("**MSJC**"), and was treated principally by Dr. Adebowale Adegbenro. (Hodnett Aff. ¶ 9.)

On October 1, 2014, Plaintiff submitted an application for benefits under an insurance policy that he held with non-party Auto-Owners Insurance Company ("**Auto-Owners**"). On that application, Plaintiff provided information about the August 21, 2014 accident and the treatment he received at the hospital, characterizing his injury as "Neck (Whiplash) and Arm Pain" and indicating that he

expected to receive additional medical treatment for it. (Def.'s Mot. Ex. 10 at Pg ID 309-10.) In the section of the application entitled "wage loss," Plaintiff represented that he was not "on the job working" when the accident occurred. (*Id.* at Pg ID 310.) Plaintiff wrote "8-21-14" in the section called "Date Disability from Work Began," and wrote "10-17-14" in the section called "Date Returned or Anticipate Returning to Work." (*Id.*)

Plaintiff successfully applied for lost-wage compensation benefits from Auto-Owners, and in a letter dated October 16, 2014, Auto-Owners notified Plaintiff that in order to continue receiving those benefits past October 17, 2014, he would have to submit a "disability slip from your treating physician . . . [which] should include your current restrictions and the duration of time you will require reimbursement for lost wages." (Def.'s Mot. Ex. 11.)

On October 18, 2014, Plaintiff was examined by Dr. Adegbenro at MSJC. Dr. Adegbenro's report regarding that visit stated that Plaintiff "was advised by this office . . . not to report for work" from October 18, 2014 to November 18, 2014. (Def.'s Mot. Ex. 12.) Dr. Adegbenro also indicated in the report that Plaintiff "states he is not [allowed] to work [with] restrictions (i.e. sedentary work/light work)."[3] (*Id.*) Defendant acknowledges that it received Dr. Adegbenro's report on or around

---

[3] The handwriting on this report is difficult to read, but this is Defendant's interpretation of the note (*see* Def.'s Mot. at 3, Pg ID 262), and Plaintiff does not dispute it.

October 18, 2014. (*See* Def.'s Mot. at 12-13, Pg ID 271-72.)

Five days later, on October 23, 2014, MSJC faxed a form called "Recommended Work Restrictions" to Auto-Owners. (Def.'s Mot. Ex. 13.) On that form, Dr. Adegbenro stated that Plaintiff would require a work restriction of "[n]o lifting over 15-20 lbs." (*Id.* at Pg ID 317.) Dr. Adegbenro also wrote that Plaintiff's ability to return to full duty would be determined after his next reevaluation, but that he could return to limited duty as of October 18, 2014 "with restrictions if [this] can be accommodated at work." (*Id.*) Lastly, Dr. Adegbenro reiterated that "[p]atient states he will not be allowed to work with restrictions." (*Id.*) Relevantly to this, Plaintiff later testified as follows:

> Q. Was there a specific reason [the MSJC treating physicians] might have told you during your visits why you couldn't perform whatever jobs that you had had before?
>
> A. Just that I might reinjure myself.
>
> Q. Was there anything specific about your condition they said prevented you from doing those tasks?
>
> A. I'm not sure, a hundred percent sure.
>
> *Q. Did you ever try to return to work and ask for accommodations maybe within a different position at Chardam or any other company where you might have been able to get different responsibilities that wouldn't have been so physically demanding as your job was before?*
>
> *A. No.*

(Def.'s Mot. Ex. 14, February 10, 2017 Deposition of Toby Hodnett ("**2017 Hodnett Deposition**")[4] at 61:4-17 (emphasis added).)

On November 7, 2014, "[h]aving had no contact with Plaintiff since August 29, 2014" (as Defendant contends), Defendant terminated Plaintiff's employment via a letter written by company president Mike Brzoska. The body of the letter read as follows:

> As of today, November 7, 2014, Chardam Gear Co has terminated your employment.
>
> Please contact Erik Schmidt (Plant Manager) to make arrangements to pick up any personal items and to return any property of Chardam Gear.
>
> Per the policies of Chardam Gear your Insurance benefits will cancel on 11/30/2014. At that time, Basic Cobra Administration will contact you directly with regards to the Cobra program.

(Def.'s Mot. Ex. 15.)

Plaintiff responded in a letter dated November 13, 2014, but faxed to Defendant on November 15:

> I have been on a protected medical leave since August 22, 2014.
>
> I am ready willing and able to return to work on November 18, 2014 with no restrictions.
>
> If my medical leave has expired before 11/18/14 please notify me as of when my leave time expired.

---

[4] This second Hodnett Deposition, like Schmidt's deposition, was taken in 2017 in the course of *Hodnett v. Auto-Owners Insurance Company*, Macomb County Circuit Court Case No. 16-3696-NF, Plaintiff's lawsuit against his auto insurer, discussed *supra*, p. 3 n.2.

(Def.'s Mot. Ex. 16.) Plaintiff provided his phone number above his signature on the letter. (*Id.*)

Brzoska replied in a letter dated November 18, 2014:

This letter is in response to your letter dated November 13, 2014. While you refer to having been on a "protected medical leave" since August 22, 2014, this is incorrect. You did not seek leave in accordance with the company's policies. You provided incorrect information to your doctor about having restrictions, when you never discussed with anyone at the company about whether you could work with any restrictions. You had no discussions with any supervisor at the company since your last day of work on August 29, 2014.

As you were advised in our letter dated November 7, 2014, your employment at Chardam Gear Company, Inc. has terminated.

(Def.'s Mot. Ex. 17.)

### 4. Events after Plaintiff's termination (December 2014 – present)

Plaintiff continued to receive benefits pursuant to his Auto-Owners insurance policy after he was terminated, and these benefits included job placement assistance. (Hodnett 2017 Dep. 60:9-19.) On June 25, 2015, Plaintiff completed a Job Seeker Survey for the Michigan WORKS! program. (Def.'s Mot. Ex. 20.) On that survey, Plaintiff indicated that he did not have a disability. (*See id.* at Pg ID 409.)

On August 11, 2015, Dr. Steven Arbit performed an Independent Medical Evaluation of Plaintiff at the request of Plaintiff's insurance company. Dr. Arbit's report was sent to the insurance company on September 15, 2015. (Def.'s Mot. Ex. 21.) Dr. Arbit's comprehensive report was based both on Dr. Arbit's own

examination of Plaintiff and on his review of Plaintiff's medical records. Dr. Arbit noted in the report that according to an MRI in Plaintiff's records, he appeared to have preexisting lower back and neck issues. (*See id.* at Pg ID 417-18.) Dr. Arbit stated that in his opinion, Plaintiff had "cervical, thoracic, and lumbar sprain/strain syndrome," but he also suggested that these were owing to (or at least exacerbated by) the preexisting conditions, and that he did "not see any objective abnormalities" that would have resulted from the August 2014 car accident. (*Id.* at Pg ID 418.) Finally, Dr. Arbit concluded that "[i]t is my opinion he is able to return to work without restrictions." (*Id.*)

On September 24, 2015, Auto-Owners suspended "all Personal Injury Protection benefits except for wage loss," having concluded that "it does not appear that [Plaintiff's] continued treatments are related to the 08/21/2014 motor vehicle accident." (Def.'s Mot. Ex. 23 at Pg ID 422.) Plaintiff did continue to receive wage loss benefits from Auto-Owners after that date; he testified that those benefits were terminated in September 2016. (Hodnett 2017 Dep. 64:24-65:14.)

## B.    Factual Disputes

In Plaintiff's Response, which contains a June 15, 2017 Affidavit that Plaintiff filed after Defendant's Motion for Summary Judgment, Plaintiff raises several factual disputes.

First, he avers that he "did not tell Jennifer Taylor or anyone else at Chardam

on or about August 21, 2014 that I was leaving or quitting my employment with Chardam." (Hodnett Aff. ¶ 1.) This refers to Taylor's handwritten note regarding her conversation with Plaintiff before he left work on that date, that "this would probably be the last time I would see him." (Def.'s Mot. Ex. 1.)

Second, Plaintiff avers that he "informed Chardam that I had been in the automobile accident and that my doctor had me off work because of the injuries I sustained in the accident." (Hodnett Aff. ¶ 5.) He does not explain the manner in which he communicated with Chardam, or who he informed. He further avers that "Chardam never asked me to fill out any paperwork to be off, and never asked me to fill out any FMLA certification paperwork," and that "[i]f Chardam had asked me to fill out any paperwork or documentation for my FMLA leave, I would have done so." (Hodnett Aff. ¶¶ 6-7.) Brzoska stated in his November 18, 2014 letter to Plaintiff that Plaintiff "did not seek leave in accordance with company policies." (Def.'s Mot. Ex. 17.) Schmidt's deposition testimony suggests that Defendant has at least some formal employment policies, but "no set procedure." (Schmidt Dep. 37:21-38:1, 45:13-16.) Defendant has not submitted documentary evidence of any policies, employment-related or otherwise.

Finally, the most significant factual dispute is over the extent to which Plaintiff was in contact with Defendant between August 29, 2014 and November 7, the effective date of his termination. Defendant represents unequivocally that it had

no contact with Plaintiff between those two dates. (*See* Def.'s Mot. at 3, Pg ID 262.)

Plaintiff disputes this assertion in several respects in his Affidavit. First, he avers that at some non-specific point between those two dates, he was "in communication with Jennifer Taylor." (Hodnett Aff. ¶ 13.) (Taylor was an employee of Defendant who was responsible for maintaining employment records. (Schmidt Dep. 54:14-16.)) More specifically, Plaintiff avers that "I told Jennifer Taylor that I was under the care of a doctor and that the doctor was evaluating me every month . . . . I asked Jennifer Taylor after my accident if there was paperwork I could fill out for short-term disability." (Hodnett Aff. ¶¶ 13-14.) He also avers that he provided Defendant with "all doctors [*sic*] notes that they requested." (*Id.* ¶ 20.) Plaintiff also avers that he had a phone conversation with company president Mike Brzoska before receiving the termination letter, in which Brzoska told him that he would be terminated. (*Id.* ¶ 15.)

Also relevant to the question of whether the parties had any contact between August 29 and November 7 of 2014 is Schmidt's deposition testimony reflecting that Defendant had among its records several different internal forms that recognized that Plaintiff was on some form of disability leave as of August 22, 2014, the day after the accident. One document, which was signed by Taylor on October 3, 2014, indicated that Plaintiff had a "period of disability [from] 8/22/14 to 10/3 of 2014," and stated on a different line "Period of disability from 8/22/2014 to current [*i.e.*,

October 3, 2014].” (Schmidt Dep. 42:3-44:5.) Schmidt's deposition testimony also confirmed that Taylor signed two other documents that were dated October 4, 2014 and December 5, 2014, one or both of which stated "First date of disability, 8/22/14." (Schmidt Dep. 44:6-23.)

### C. Relevant Procedural History

Plaintiff initiated this action in the Macomb County Circuit Court on November 6, 2015, and after Defendant was served with process on January 29, 2016, the action was removed to this Court on February 19, 2016. (ECF No. 1, Notice of Removal; Ex. 1, Compl.) Plaintiff's complaint asserts two claims against Defendant based on allegations that Defendant terminated Plaintiff subsequent to his taking medical leave: violation of the FMLA (Count I), and violation of the PWDCRA (Count II).

Defendant filed the instant Motion for Summary Judgment on May 30, 2017. (ECF No. 18, Def.'s Mot.) Plaintiff filed a Response on June 20, 2017 (ECF No. 21, Pl.'s Resp.), and Defendant filed a Reply on July 5, 2017 (ECF No. 24, Def.'s Reply.). This Court conducted a hearing on Defendant's Motion for Summary Judgment on August 7, 2017, and now issues the following ruling.

## II.  LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d

515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III. DISCUSSION

Plaintiff's FMLA claim can be analyzed both as an "interference" claim and as a "retaliation" claim under the statute. A defendant may obtain summary judgment on either type of FMLA claim if it states a legitimate reason for its challenged conduct, and if the plaintiff cannot then demonstrate that that reason is pretextual. Defendant has proffered such a reason: that Plaintiff "engaged in fraud and/or dishonesty" when he represented to his health care providers that Defendant would not allow him to work with restrictions. (Def.'s Mot. at 16, Pg ID 275.) For his part, Plaintiff has not shown that a reasonable jury could find that this justification is pretextual. Plaintiff has also admitted that he never requested accommodations from Defendant, thereby negating an essential element of his PWDCRA claim. Accordingly, the Court will grant Defendant's Motion for

Summary Judgment.

## A. Family and Medical Leave Act Claim (Count I)

The Family and Medical Leave Act ("**FMLA**") entitles eligible employees to "a total of 12 workweeks of leave during any 12-month period" in certain defined circumstances. 29 U.S.C. § 2612(a)(1). Only one is applicable here: "a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Id.* § 2612(a)(1)(D).

Two FMLA provisions prohibiting specific conduct by employers are at issue in this case. Title 29 U.S.C. § 2615(a)(1) (the "interference provision") makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." Title 29 U.S.C. § 2615(a)(2) (the "retaliation provision") makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."

Plaintiff's allegations could give rise to causes of action under either theory, and Defendant's Motion for Summary Judgment addresses both. Accordingly, after discussing the preliminary issue of whether Plaintiff had "a serious health condition that [made him] unable to perform the functions" of his position, 29 U.S.C. § 2612(a)(1)(D), the Court analyzes Plaintiff's claims under both the interference and retaliation theories. In the end, Plaintiff has not shown that a reasonable jury could

find that Defendant's stated justification for his firing—Plaintiff's misrepresentation to his treating physician that he would not be allowed to work with restrictions—was pretextual.

On October 18, 2014, Defendant received an examination report stating that Plaintiff had told his doctor that he could not work with restrictions. Then, in a post-termination follow-up letter on November 18, 2014, Brzoska stated that Plaintiff "provided incorrect information to your doctor about having restrictions, when you never discussed with anyone at the company about whether you could work with any restrictions." (Def.'s Mot. Ex. 17.) Further, as discussed on page 8, *supra*, Plaintiff has admitted that he never requested disability accommodations from Defendant. These facts entitle Defendant to summary judgment on both theories of Plaintiff's FMLA claim.

### 1. Serious health condition

Defendant argues at the threshold that Plaintiff did not meet the standard for a "serious health condition" under the FMLA. For the reasons articulated below, however, Defendant has failed to show that Plaintiff cannot raise a genuine issue of material fact on this issue.

The FMLA defines the term "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital, hospice, or residential medical care facility; or . . . continuing treatment

by a health care provider." 29 U.S.C. § 2611(11). The statute's implementing regulations list several categories of circumstances which would allow an employee to meet the standard for "serious health condition." One such category is "Incapacity and treatment," which requires "[a] period of incapacity of more than three consecutive, full calendar days" as well as a course of treatment that meets certain specified standards. 29 C.F.R. § 825.115(a). Another is "Chronic conditions," and these include any condition that

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c).

Defendant maintains that "[t]o constitute 'continuing treatment,' plaintiff must have a period of incapacity of more than three consecutive, full calendar days." (Def.'s Mot. at 18, Pg ID 277 (quoting 29 C.F.R. § 825.115(a)).) Defendant points out that Plaintiff indicated a willingness to return to work without restrictions in response to his termination letter on November 18, 2014, and that this validates the 2015 medical evaluation that stated that Plaintiff could return to work without restrictions. Defendant also identifies various indications from 2015 and after—the job survey that Plaintiff filled out, for instance, and testimony in Plaintiff's 2016 and

18

2017 depositions—that Plaintiff was not prevented from engaging in major life activities by injuries that he sustained in the accident.

A period of incapacity of more than three consecutive calendar days is one way that an employee can meet the standard, but it is not the only way. Regardless of whether Plaintiff was incapacitated for three or more days, the record shows that he does meet the standard for "chronic conditions" set forth in 29 C.F.R. § 825.115(c) (and quoted above): he had periodic visits with health care providers, and his incapacity was episodic rather than concentrated. (The record does not reveal how many medical visits and physical therapy sessions Plaintiff had for injuries from the accident.)

All of the evidence that Defendant cites as showing that Plaintiff had no symptoms of physical disability are from well after Plaintiff's purported FMLA leave period, and the FMLA does not provide that a "chronic condition" cannot be a condition that is later treated or even cured.

For these reasons, the Court rejects Defendant's threshold argument that Plaintiff was never entitled to FMLA leave due to his lack of a "serious health condition."

### 2.    Retaliation theory

FMLA retaliation claims may be proven by either direct or circumstantial evidence. Direct evidence in this context is defined as evidence that "does not require

a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part" by an unlawful motive. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). Plaintiff does not argue that he has adduced direct evidence of retaliation on Defendant's part—nor is there a colorable argument to that effect to be made in any event—and so the Court will analyze Plaintiff's FMLA claim, to the extent that it is premised on a retaliation theory, under the classification of circumstantial evidence.

Under that rubric, a plaintiff must show with circumstantial evidence that

(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 549, 556 (6th Cir. 2006)).

If the plaintiff succeeds in this, the burden shifts to the defendant to "present a legitimate, nondiscriminatory reason for its decision" to take the challenged action; if that burden is met, the claim can only survive summary judgment if the plaintiff can demonstrate that the defendant's "stated reasons are a pretext for unlawful discrimination." *Id.* This requires the plaintiff to show that "(1) that the proffered

reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009)). Even if the plaintiff makes this showing, Defendant can still prevail if it is "able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. . . . [T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Romans*, 668 F.3d at 839 (internal quotation marks and citations omitted).

Here, Defendant argues that Plaintiff's case fails on the second element (employer knowledge of employee's FMLA activity) because Plaintiff did not give Defendant notice of his intention to take FMLA leave. Defendant also argues that Plaintiff cannot satisfy the fourth element (causal connection between protected activity and adverse employment action) because the report that Defendant received from Dr. Adegbenro indicated that Plaintiff had been advised not to report to work until after the purported leave period expired. Both arguments lack merit.

Defendant's argument on the second element is based on an assertion that Plaintiff cannot show that Defendant knew that Plaintiff was exercising his rights under the FMLA. In demonstrating that an employer was given sufficient notice under the FMLA, "[t]he employee's burden is not heavy." *Wallace v. FedEx Corp.*,

764 F.3d 571, 586 (6th Cir. 2014). "[T]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The *employer* will be expected to obtain any additional required information through informal means." *Id.* (emphasis in original) (quoting 29 C.F.R. § 825.303(b)). "[A]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA § [2612(a)(1)] has occurred." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 723-24 (6th Cir. 2003)).

In light of these principles, Defendant's contention that "[t]here is simply nothing to support that plaintiff ever requested FMLA leave from Chardam" (Def.'s Mot. at 13, Pg ID 272) is inaccurate, as there is at least some evidence that Defendant had notice of Plaintiff's intention to take medical leave. That evidence includes:

- Defendant's record of Plaintiff's having called out of work for Friday, August 22, 2014 and Saturday, August 23, 2014 specifically because of the "car accident" (Def.'s Mot. Ex. 4);
- Plaintiff's averments in his Affidavit that he "told Jennifer Taylor that I was under the care of a doctor and that the doctor was evaluating me every month," and that he asked Taylor "if there was paperwork I could fill out for short-term disability" (Hodnett Aff. ¶¶ 13-14);
- Schmidt's deposition testimony acknowledging the existence of internal records, signed by Taylor, which stated that Plaintiff's "[p]eriod of disability" began on August 22, 2014, and which were dated on October 3, October 4, and December 5 of 2014 respectively (Schmidt Dep. 42:3-46:16.); and

- Dr. Adegbenro's October 18, 2014 examination report, which states that Plaintiff was advised not to report for work from October 18, 2014 to November 18, 2014 (Def.'s Mot. Ex. 12), and which Defendant admits that it received on or around October 18, 2014 (*see* Def.'s Mot. at 3, 12-13, Pg ID 262, 271-72).

This evidence is not conclusive. Indeed, there is at least one significant evidentiary gap: the internal document showing that Plaintiff called Defendant to advise that he would miss work because of the car accident (Def.'s Mot. Ex. 4) shows that he only requested leave for August 22 and 23. There is no contemporaneous evidence that he extended his leave past those dates for that reason. Significantly, evidence establishes that Plaintiff did not report to work on August 25 because he had "no ride" (Def.'s Mot. Ex. 5); that he requested leave on August 26 for unspecified reasons (Def.'s Mot. Ex. 6); and that he was present at work on August 29 at least for long enough to sign a form requesting a "vacation day" on September 2 (Def.'s Mot. Ex. 7). *Nothing* about medical issues! Plaintiff's Affidavit states that at some point, unspecific as to date and whether by phone or writing, Plaintiff "told Jennifer Taylor that [he] was under the care of a doctor and that the doctor was evaluating [him] every month," and that he asked Taylor "if there was paperwork [he] could fill out for short-term disability." (Hodnett Aff. ¶¶ 13-14.) Those conclusory averments, vague as to specificity, are insufficient by themselves to create a genuine issue of material fact on the question of notice. *See Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577 (6th Cir. 2007) ("A mere scintilla of

evidence is insufficient; 'there must be evidence on which the jury could reasonably find for the [non-movant].'") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). On the other hand, Defendant does admit that it received Dr. Adegbenro's October 18, 2014 examination report on or around the date it was written. This evidence is enough to raise a jury question over whether Defendant knew Plaintiff was exercising his rights under the FMLA after August 2014.

Defendant also contends that Plaintiff's FMLA claim, if premised on a retaliation theory, fails at the final prong of the *prima facie* standard because Plaintiff cannot show a causal link between his purported FMLA-protected activities and his termination. Specifically, Defendant argues that "[b]ased on his own medical records, which show that he could not come back to work after the purported FMLA leave expired," Plaintiff cannot demonstrate the required causal connection "because he could not return to work on November 14, 2014, and was still off work in accordance with his doctor's orders more than a year later." (Def.'s Mot. at 15-16, Pg ID 274-75.) This refers to two separate medical records: (1) the October 18, 2014 report that Defendant received from Dr. Adegbenro, which indicated that Plaintiff had been "advised . . . not to report for work from Oct[ober] 18, 2014 to Nov[ember] 18, 2014" (Def.'s Mot. Ex. 12); and (2) a post-examination "follow-up note" by Dr. John Marshall, who examined Plaintiff on December 4, 2015 on referral from Dr. Adegbenro, and who stated that as of that date, Plaintiff was "currently on

restrictions and off work per Dr. [Adegbenro], his chiropractor." (Def.'s Mot. Ex. 22.) Thus Plaintiff was still restricted from work by his doctors on December 4, 2015. This undermines any claim that he was able and willing to work without restrictions in late 2014.

The Sixth Circuit has explained that in the FMLA retaliation context, "[t]he burden of proof at the prima facie stage is minimal," and has "embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (internal quotation marks and citations omitted). In fact, this burden was deemed satisfied in *Seeger* solely by a lapse of just under two months between the beginning of the leave period and the effective date of the termination, *see id.* at 283, and the court in *Seeger* approvingly cited previous Sixth Circuit decisions that held that lapses of two months and three months respectively were enough to establish a causal link at the *prima facie* stage. *See id.* (citing *Clark v. Walgreen Co.,* 424 F. App'x 467, 473 (6th Cir. 2011) (per curiam) and *Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007)). The period in this case of approximately two and a half months between the beginning of Plaintiff's purported leave period and his termination date is sufficient for Plaintiff to meet the causation prong of the *prima*

*facie* standard. Defendant does not dispute that Plaintiff's termination constituted an adverse employment action against him. One issue of whether Plaintiff was engaging in FMLA-protected activity revolves around whether Plaintiff gave proper notice. If all reasonable inferences of a *prima facie* case are drawn in Plaintiff's favor, the burden therefore shifts to Defendant to articulate a legitimate, nonretaliatory reason for Plaintiff's termination. In the November 18, 2014 letter that company president Mike Brzoska wrote to Plaintiff as a follow-up to the termination notice, Brzoska stated that "[y]ou provided incorrect information to your doctor about having restrictions, when you never discussed with anyone at the company about whether you could work with any restrictions. You had no discussions with any supervisor since your last day of work on August 29, 2014." (Def.'s Mot. Ex. 17.) Defendant argues that, based on this, Plaintiff "engaged in fraud and/or dishonesty by providing incorrect information to his doctor about whether plaintiff could work with any restrictions." (Def.'s Mot. at 17, Pg ID 276.)

Defendant sets forth the following motive for this:

Plaintiff's insurance company had advised plaintiff that if he lost his job because he could not return to work without restrictions, the insurance company would continue to pay plaintiff's wages until he could return to work at another job, and if that job paid less, the insurance company would supplement his wages to equal what he earned at Chardam. By lying to Dr. [Adegbenro], plaintiff could ensure that he would get paid, month after month, as long as he could claim he lost his job as a result of the car accident.

(*Id.* at 16-17, Pg ID 275-76.) Indeed, Plaintiff's counsel acknowledged at the hearing on the instant Motion that according to Plaintiff's June 15, 2017 Affidavit, Plaintiff was still receiving wage-loss compensation disability benefits from his insurance company through August 2017. (ECF No. 25, Transcript of August 7, 2017 Motion Hearing at 33:6-19.)

Brzoska did cite Plaintiff's giving "incorrect information" to his doctor as a reason for his termination in the November 18, 2014 letter. Given this contemporaneous evidence of a nonretaliatory basis for the termination, the Court finds that Defendant has stated a legitimate reason for the decision in this regard.

The burden thus shifts back to Plaintiff to show that "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans*, 668 F.3d at 839. Plaintiff maintains that his understanding was that Defendant would not in fact have allowed to him to work with restrictions; that he never made any knowing misrepresentations to Defendant or to Dr. Adegbenro; and that once Defendant became aware of the indications in Dr. Adegbenro's report that Plaintiff had represented that he was not allowed to work with restrictions, Defendant could have notified Plaintiff if this was not the case.

At its core, Plaintiff's argument is that he held a reasonable, good-faith belief that Defendant would not have allowed him to work with restrictions, and that stating

that belief to Dr. Adegbenro did not constitute fraud or dishonesty. However plausible Plaintiff's assertions are, though, they do not show that Defendant's stated reason for his firing was pretextual under *Romans*, because they do not show that that reason was factually baseless, subjectively not the reason for the decision, or objectively insufficient as a justification. Plaintiff has not shown that Defendant's reason for terminating him was not honestly held, and this is what is required for a finding of pretext. *See Seeger*, 681 F.3d at 285–86 ("As long as the employer held an honest belief in its proffered reason, 'the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.'") (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)); *see also Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 399 (6th Cir. 2009) (noting in the analogous context of Title VII pretext analysis that a federal court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments") (internal quotation marks omitted).

Even though Plaintiff makes a *prima facie* retaliation case, Defendant has met its burden of articulating a legitimate justification for its challenged conduct, and Plaintiff has not rebutted that justification by showing that it is pretextual. For this reason, the Court will grant Defendant's Motion for Summary Judgment to the extent that Plaintiff's FMLA claim is premised on a retaliation theory.

### 3. Interference theory

There are five elements that Plaintiff must satisfy to state a *prima facie* case on an FMLA claim premised on an interference theory:

> To prevail on an FMLA interference claim, a plaintiff must establish that (1) she was an eligible employee as defined under the FMLA; (2) her employer was a covered employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take FMLA leave; and (5) her employer denied FMLA benefits to which she was entitled.

*Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017) (quoting *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577-78 (6th Cir. 2007)).

"But a plaintiff's success in establishing her prima facie case does not create a strict liability regime for employers, who may offer 'a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct.'" *Id.* (quoting *Jaszczyszyn*, 504 F. App'x at 447). An employer's proffered legitimate reason for its actions is relevant to both retaliation claims and interference claims under the FMLA. Thus, similar to retaliation against an employee for FMLA-protected activity, "[i]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* at 327-28 (internal quotation marks omitted) (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)); *accord Harris v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 594 F.3d

476, 483 (6th Cir. 2010); *Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 507 (6th Cir. 2006).

The Sixth Circuit recently reaffirmed this principle in the published opinion *Mullendore v. City of Belding*, 872 F.3d 322 (6th Cir. 2017). The Plaintiff in that case, a city manager, was away from work on FMLA leave when "the city council voted to terminate her employment, citing her role in causing political strife in the community." *Id.* at 324. Affirming the district court's dismissal of the plaintiff's FMLA interference claim on summary judgment, the Sixth Circuit concluded that "the evidence clearly demonstrates that [the plaintiff] was terminated in this way because she was not at the meeting and the City Council could therefore fire her without having to face her. This does not establish that her termination was because she was using FMLA leave . . . ." *Id.* at 328. The plaintiff in *Mullendore* argued that she would not necessarily have been terminated had she not taken FMLA leave, and cited evidence that one of the members of the city council (Jones) would have voted differently had the plaintiff been present at the meeting. The court rejected this argument:

> The problem with [the plaintiff]'s theory of her case is that it equates a termination in her absence with a termination because she was absent on FMLA-qualifying medical leave. The former is permissible, even when an employee is on medical leave; the latter is not permissible. *See Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) ("An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement,

but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave."). But she has offered no evidence in support of her claim that she was terminated because she was on FMLA leave, even if the timing of [the] motion made it easier to get Jones's vote. At best, her theories raise "a mere scintilla of evidence," which is insufficient to defeat summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. 2505. [The plaintiff] does not present evidence that the City Council fired her in a way that interfered with her FMLA entitlement, even though the firing occurred while she was out for surgery, so it was not erroneous for the district court to grant summary judgment.

*Mullendore*, 872 F.3d at 329.

Thus, under *Mullendore*, Plaintiff's interference claim in the case at bar cannot be sustained for the same reasons that his retaliation claim must fail. Defendant has proffered a legitimate explanation for its decision to terminate Plaintiff: his (mis)representation to his health care providers that he would not be allowed to work with restrictions. And as set forth above, Plaintiff has not rebutted that explanation by demonstrating "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Mullendore*, 872 F.3d at 328 (internal quotation marks omitted) (quoting *Grace*, 521 F.3d at 670).

The Sixth Circuit established in *Mullendore* that the operative question is not whether the employee would (or even could) not have been terminated but for her FMLA-protected activity, but instead whether "she lost the position *because she took*

*FMLA-qualifying leave*." *Mullendore*, 872 F.3d at 328 (emphasis added). In this way, *Mullendore* clarified that previous Sixth Circuit decisions' description of an employer's legitimate reason as being "unrelated to the exercise of FMLA rights" is not a strictly literal requirement; what 29 U.S.C. § 2615(a) in fact prohibits are adverse actions by employers against employees that are *motivated by* the employees' exercise of FMLA rights, and not adverse actions that are *in any way related* to the exercise of those rights. *See Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 362–63 (6th Cir. 2013) ("[W]here . . . the legitimacy of the employee's taking of FMLA leave itself is at issue, it is unrealistic to require that the employer's reasons for its actions be 'unrelated' to the taking of the leave. If that were the case, employers would effectively be precluded from ever taking any adverse action against an employee who fraudulently or dishonestly requests FMLA leave or misuses or abuses FMLA leave because any action necessarily would be related to the taking of leave, and, hence, constitute a violation of the Act.") (Rosen, D.J., concurring).

Here, Defendant has stated a reason for its decision to terminate Plaintiff that is supported by contemporaneous evidence. That reason is not that Plaintiff was terminated because he took FMLA leave, but rather that in Defendant's view, he "engaged in fraud and/or dishonesty" in the way that he took it. (Def.'s Mot. at 17, Pg ID 276.) As Plaintiff has failed to rebut that explanation as pretextual, the Court

will grant Defendant's Motion for Summary Judgment to the extent that Plaintiff's FMLA claim is premised on an interference theory.

**B.     Persons With Disabilities Civil Rights Act Claim (Count II)**

Michigan's Persons With Disabilities Civil Rights Act ("**PWDCRA**") generally provides that "a person shall accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation would impose an undue hardship." Mich. Comp. Laws § 37.1102(2). Michigan courts have interpreted the PWDCRA to "require[] an employer to take reasonable steps to accommodate a handicapped employee's disability." *Petzold v. Borman's, Inc.*, 241 Mich. App. 707, 716 (2000).

The law is clear, though, that under the PWDCRA, the initial burden is on the employee to propose accommodations. *See* Mich. Comp. Laws Ann. § 37.1210(18) ("A person with a disability may allege a violation against a person regarding a failure to accommodate under this article only if the person with a disability notifies the person in writing of the need for accommodation within 182 days after the date the person with a disability knew or reasonably should have known that an accommodation was needed."); *see also Petzold*, 241 Mich. App. at 716 ("In order to bring a cause of action under the statute for failure to accommodate in employment, the employee must advise the employer in writing of the need for

accommodation.") (citing *Sanchez v. Lagoudakis (After Remand)*, 458 Mich. 704, 724 n.25 (1998)); *Aldini v. Kroger Co. of Michigan*, 628 F. App'x 347, 351 (6th Cir. 2015) (explaining, in analyzing parallel claims under the PWDCRA and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, that the burden to request an accommodation is "on the employee because '[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation'") (alterations in original) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)).

Plaintiff testified in his 2017 deposition that he never made such a request of Defendant:

> Q. Did you ever try to return to work and ask for accommodations maybe within a different position at Chardam or any other company where you might have been able to get different responsibilities that wouldn't have been so physically demanding as your job was before?
> A. No.

(Hodnett 2017 Dep. 61:11-17.)

Defendant highlights this admission in its Motion, and Plaintiff does not address it in his Response. Because Plaintiff has therefore not met his burden on this essential element of his PWDCRA claim, the Court will grant Defendant's Motion for Summary Judgment as to this claim as well.

## IV. CONCLUSION

For all of the reasons stated above, the Court hereby GRANTS Defendant

Chardam Gear Company, Inc.'s Motion for Summary Judgment.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: December 28, 2017

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 28, 2017.

s/D. Tofil
Deborah Tofil, Case Manager